# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

NO. 03-17-00704-CV

Ericka Margaret Norman, Appellant

v.

Benjamin David Martin, Appellee

FROM THE DISTRICT COURT OF TRAVIS COUNTY, 53RD JUDICIAL DISTRICT
NO. D-1-FM-15-005568, HONORABLE ORLINDA NARANJO, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

In its Order in Suit Affecting the Parent-Child Relationship, the trial court appointed appellant Ericka Margaret Norman and appellee Benjamin David Martin joint managing conservators of their son, S.M.N., gave Norman the right to establish the child's residence within Travis County, barred Norman's brother from being present at exchanges of the child, and denied Norman's request for retroactive child support. Norman argues that the trial court abused its discretion in restricting S.M.N.'s residence to Travis County and in refusing to order retroactive child support. We will affirm the trial court's order.

### Factual and Procedural Background

S.M.N. was born in August 2014. In September 2015, Martin filed an original petition asking that he and Norman be named joint managing conservators and that the child's residence be restricted to Travis County and contiguous counties. Norman filed a counterpetition,

in which she asked to be given the right to determine the child's residence within Travis County, Harris County, and all counties contiguous to Travis or Harris County. She also sought child support retroactive to S.M.N.'s birth. The trial court signed temporary orders in November 2015, naming Norman and Martin as temporary joint managing conservators, giving Norman the right to designate S.M.N.'s residence within Travis County and any contiguous county, setting out a visitation schedule, and ordering Martin to pay $400 a month in child support. Martin later amended his petition asking either that he be given the right to determine S.M.N.'s residence or that a geographical restriction be placed on the child's place of residence.

Martin works for the Internal Revenue Service and lives in an apartment in the Pflugerville area. He testified that he met Norman in 2004, that they were together for about ten years, planning to get married, and that in the fall of 2013, they decided to have a child. During the pregnancy, Norman informed Martin that she had changed her mind and no longer wanted to marry him. She still wanted to live together and raise the child together, so Martin moved into her apartment. Martin had prepared to take several months off after S.M.N.'s birth, but Norman instead asked Martin to return to work, and Norman's mother Mary came to Austin to care for S.M.N. Martin testified that he offered to pay $1,000 each month for rent but that Norman "did not accept any money from me" and that he instead bought $100 to $150 in groceries each month plus "incidentals" for S.M.N. He also testified that after they split up, he attempted to pay Norman $350 a month in child support via electronic transfers but that she never accepted those payments either. Martin testified that he owed about $80,000 in personal debts.

2

Martin testified that he was present at S.M.N.'s birth and that Norman's family was "very critical" and hostile toward him whenever Norman was not around. Martin was not listed on S.M.N.'s birth certificate, a fact that Norman admitted, and he testified that he did not learn that Norman had omitted him from the birth certificate until just before he filed this suit. Martin said he sued because Norman "had stopped letting me see [S.M.N.] on a regular basis. I went from seeing him two or three times a week to seeing him none." Martin also testified that in her deposition, Norman was asked "what names she used for [Martin] with your son," and that she answered, "Mr. Martin." Martin said Norman's explanation was that "she thought it would be respectful," but he believed she should refer to him as "Dad" or something similar.

During the case, Norman had moved from an apartment in northwest Austin, about twenty minutes from Martin's apartment in the Pflugerville area, to Hudson Bend, about forty-five minutes away, giving him only one day of notice. She then moved to Bastrop, which is an hour to an hour and fifteen minutes away, again giving Martin only one day's notice of the relocation. Martin testified that Norman worked in Houston two days a week and that he wants to care for S.M.N. on those days, but that Norman has refused to give him expanded access, leaving Mary and Norman's brother Ben[1] as S.M.N.'s caregivers instead.

Martin testified that Norman had made false allegations of abuse against him, which angered him because "she knows that I am not the kind of person who would ever hurt my son. She knows that I didn't do that to him and I wouldn't do that to him." Martin was not sure whether

---

[1] Both Martin and Norman's brother are named Benjamin. For clarity, we will refer to Martin by his last name and to Norman's brother as "Ben."

3

Norman had explicitly accused him as the abuser but he said that she "certainly seemed to be saying that," testifying that Norman had taken "at least 1,000" photographs of alleged injuries to S.M.N. and had made a chart of the injuries. According to Martin, Norman "thought that [S.M.N.'s injuries] were increasing during the time she was living at Hudson Bend." He said that the Texas Department of Family and Protective Services ("DFPS") and the police had closed their cases without concluding that S.M.N. had been abused. S.M.N. sustained a stress fracture while playing on a slide in Martin's care, and Martin testified that the hospital's care team reviewed the injury and found no abuse or neglect and that he did not know if DFPS was called about S.M.N.'s injury.

Martin asked for a "50/50" visitation schedule and that he be allowed to determine S.M.N.'s place of residence to give S.M.N. consistency. He testified that he learned while the case was pending that Norman was considering moving with S.M.N. to Houston or Atlanta and that Norman had suggested video conferences when he asked how she thought Martin and S.M.N. could maintain their relationship if S.M.N. were relocated. Martin was unhappy with that suggestion because he wanted to be near enough to attend doctor's appointments, school plays, conferences, sports, and the like. He explained, "Plus he is, at this age, very young. Constant, frequent contact is still a major part of his life." He also had concerns about S.M.N. moving farther away because he had a "constant kind of feeling like [Norman] is trying to shorten visits or trick me out of time." Martin wanted S.M.N. to continue to live in Austin because "I live here. His extended family lives here. His cousins live here. My parents live here." He said that his family was involved with S.M.N. and that he had some flexibility in his work schedule, which was currently a 3:00 p.m. to 11:30 p.m. shift Monday through Friday. Martin testified that he might not be so opposed to

Norman's moving "if we had a relationship that was sunshine and roses over the past three years," but that he was opposed based on her recent habit of canceling Martin's visits.

Martin testified that he had believed he had a good relationship with Norman's mother Mary, but that he has since learned that she does not like him. Martin further said that Norman's brother Ben, also the person with whom Martin often exchanges S.M.N. for visitations, is "hostile towards [Martin] at the drop-offs if something is not the way he wants it to be" and will yell at and insult Martin in front of S.M.N. Martin was asked if he had seen Ben do anything unusual at an exchange, and he said,

> I feel like the time that they took him and were immediately stripping off his clothes in the back seat of the Dakota pick up truck, they were taking pictures of him, that I thought was just weird and bizarre. It wasn't like here, let me change your diaper in the back seat. It was a full-on examination and inspection.

Martin described a February 2017 medical appointment in which S.M.N. had to have his blood drawn. Mary and Ben brought S.M.N. to the appointment, and Mary entered the examination room and "shut the door on my face," saying "something about me not being able to be in the room and . . . that I was upsetting [S.M.N.] and that [S.M.N.] didn't recognize me." When Martin insisted on entering, Ben yelled at him, tried to shove him out of the room, and then shoved him into the corner. Martin spoke to medical staff and a social worker, who allowed him to enter the room. Ben then positioned himself so that his body blocked Martin's view of S.M.N. and continued to say negative things about Martin. Martin asked the trial court to bar Mary and Ben from custody exchanges and medical appointments because "the situation has been escalating with

5

every doctor's appointment that they have been to" and they have been "generally hostile" and unpleasant in those instances.

Norman testified that she and Martin had a good relationship until S.M.N. was about a year old. During that time, Martin frequently visited S.M.N., and he and his family spent time with S.M.N. and with Norman. She was surprised when Martin filed his suit and had "no clue [it] was coming." She testified that when she asked Martin why he had sued, he told her that "he just didn't think I would agree, and so he decided he would sue me before he talked to me." After Martin filed suit, Norman's contact with Martin's family "essentially stopped," he and Norman no longer spent time with S.M.N. together, and the communication between Norman and Martin deteriorated. Norman admitted that she had not invited Martin to S.M.N.'s baptism or to any of his birthday parties, which she said were very small. Norman denied that she called Martin "Mr. Martin" when speaking about him to S.M.N., explaining that she used "Mr. Martin" in front of other people but "daddy" when speaking to S.M.N. Norman testified that she wanted her mother to remain S.M.N.'s primary caregiver until he was in preschool at some undetermined point in the future.

Norman admitted that she had turned over almost 8,000 pictures to Martin's attorney, but said that those were not all "injury pictures" and that she had been advised to document any bruises or other injuries. She also agreed that she had provided the court with a three-inch binder of injury photos, saying she did that to show S.M.N. "was regularly getting bruised." Norman said S.M.N. had undergone about twenty blood tests because there were concerns about whether he had a bleeding disorder; none of the tests had shown such a disorder. She objected to Martin having

brought S.M.N. to a dentist for a teeth cleaning because it was "invasive in some ways" and there were still questions about a possible bleeding disorder at the time.

Norman testified that she did not believe Martin had abused or neglected S.M.N., although she admitted that she had complained about possible abuse or neglect to DFPS and to the police and had told them she "did not know" if Martin was abusive when they investigated her complaints. Norman also admitted that she had videotaped Martin at exchanges. Despite her reports to the authorities, Norman said that she did not understand why Martin did not trust her and that she was hoping to increase and improve the communication between her, Martin, and S.M.N.

Norman testified that her home in Bastrop was larger, nicer, and less expensive than her Austin apartment. Because her apartment's rent was about to increase from $2,000 to $2,300, she moved from that apartment to a large motor home on the shore of Lake Travis for several months until they moved to Bastrop in about September 2016. Norman's employer has offices in far north Austin, about forty-five minutes to an hour from her Bastrop home, and on the outskirts of Houston, about two hours away. She goes to the Houston office three or four days each month, leaving Bastrop at about 6:00 a.m. to make the drive. Norman said she had resisted allowing Martin to share child care duties with Mary and Ben because Martin worked nights, while S.M.N. wakes at about 6:00 a.m. She was asked why she had been so unwilling to allow Martin, who has visitation on Wednesday and Fridays from 8:00 a.m. to 10:45 a.m., to continue to care for S.M.N. for the rest of those days, while Norman was at work, and she answered, "I don't know. . . . I don't have a reason. I guess that would be fine at this point. I don't have a reason not. I mean, I would like to get to the point where he can." Norman admitted that at a hearing four months earlier, she had objected to

Martin's request for forty-five minutes of additional visitation time "to make up for the travel to Bastrop," saying that at the time she still had questions about whether Martin had caused S.M.N.'s bruises.

Norman testified that Martin did not "directly" offer to pay rent when they were living together, but she did not explain what she meant by that answer. She also testified that he did not offer to pay for utilities and that he "[v]ery rarely" bought groceries. Asked whether before their breakup she and Martin had discussed his staying home with S.M.N. as caretaker, Norman said that Martin had said he would stay home and take care of S.M.N. if she paid him $2,000 a month to cover his bills and debts. She found that unacceptable because he was already living in her apartment for free. Norman earns about $100,000 a year.

Norman testified that about a week before trial, she had gotten a job offer in Atlanta and hoped to relocate with S.M.N. in about a month's time. She notified the trial court of her desire to relocate the Friday before trial, saying that the Atlanta job offered a higher salary and good benefits and that Atlanta had a lower cost of living, "great school districts," and "lots of exciting opportunities" for her and S.M.N. She testified that she hoped that Martin would consider relocating as well, but if not, she wanted to figure out how Martin could have monthly visits and was planning to offer "to pay for a lot of the travel."

The trial court considered a report by S.M.N.'s guardian ad litem, Christa Coker. Coker stated that she had reviewed S.M.N.'s medical records, records from DFPS, and relevant police reports. Coker concluded that Norman had "good general caretaking abilities" but also stated that Coker had concerns "about the boundary levels in [Norman's] immediate family dynamics, and

8

her ability to co-parent." Coker reported that she was further concerned that Norman was "hypervigilent" about S.M.N.'s safety "to an unhealthy level." She said Norman brought S.M.N. to the doctor for minor bug bites and bruises; made repeated reports of abuse or neglect, none of which resulted in action against Martin; and appears to have mounted "a campaign to minimize Mr. Martin's role in [S.M.N.'s] life." In her trial testimony, Coker gave much the same information and said she had spoken to S.M.N.'s pediatrician, whose main concern "was the maternal concern." Coker did not believe Norman had lied to DFPS in reporting possible abuse or neglect, but she believed Norman "kind of exaggerated things, exaggerated risk on dad's side."

Coker related in her report that she spoke to three members of the medical clinic's staff about the medical visit Martin had described. Those staff members told Coker that Mary and Ben had interfered with staff and attempted to bar Martin from the examination room. When Martin returned to the room with a social worker, Ben "physically pushed" Martin out of the room, hitting him with the door in the process. Later in the visit, Mary used Ben's hat to block Martin from seeing S.M.N. Clinic staff said that in that particular visit, Martin had been "the only calm individual present," that Martin was "continually passive and often excluded from actively participating in the appointments," and that there had been no problems in a past visit when only Martin and Norman were present.

Ben disputed Coker's report, saying he never put his hands on Martin or tried to push him, although he agreed that he tried to shut the door while Martin's foot was in the way. Ben maintained that he and his mother were never aggressive or confrontational. Mary testified similarly and explained that she was upset during the appointment because S.M.N. had to have his blood

9

drawn again due to the clinic's error. She denied using Ben's hat to block Martin's view and instead said that she caught the hat when it fell off while Ben was helping hold S.M.N. during the blood draw and that she simply held it in her lap.

After this hearing, the trial court appointed Martin and Norman as joint managing conservators, gave Norman the right to establish the child's residence within Travis County, ordered Martin to pay $484 a month in child support, and denied Norman's request for retroactive child support. The court filed findings of fact and conclusions of law, finding that it was in S.M.N.'s best interest that his residence be restricted to Travis County "so that both parents [would] be in close proximity to each other and [to] encourage a close relationship for the child to both parents." The court found that Martin's monthly net resources are $2,419.74 and that Norman's are $6,498.63.

## Geographic Restriction

In her first issue, Norman argues that the trial court abused its discretion in restricting the child's residence to Travis County, which required them to relocate from the Bastrop home where they had lived for about six months. She notes that the court's temporary orders allowed S.M.N. to live in Travis and contiguous counties and asserts that the evidence showed that Bastrop was more affordable, allowed her to have a better and safer environment for S.M.N., was closer to her job in Houston, and did not have a significant effect on S.M.N.'s contact with Martin.

Suits affecting the parent-child relationship are "intensely fact driven" and require courts to balance numerous factors. *Lenz v. Lenz*, 79 S.W.3d 10, 19 (Tex. 2002). In issues of conservatorship, possession, and access, the primary consideration of the courts is always the child's best interests. Tex. Fam. Code § 153.002; *Lenz*, 79 S.W.3d at 14. When a trial court appoints the

10

parents joint managing conservators, it must designate the parent who has the exclusive right to determine the child's primary residence and either specify the geographic area for the child's primary residence or specify that the child's primary residence may be determined without regard to geographic location. Tex. Fam. Code § 153.134(b)(1). The trial court has broad discretion in determining whether to specify a geographic limitation on a child's primary residence. *In re K.L.W.*, 301 S.W.3d 423, 428 (Tex. App.—Dallas 2009, no pet.); *see Worford v. Stamper*, 801 S.W.2d 108, 109 (Tex. 1990) (trial court's determinations on conservatorship and child support are reviewed for abuse of discretion).

A court abuses its discretion if its decision is arbitrary, unreasonable, and without reference to any guiding rules or principles. *Worford*, 801 S.W.2d at 109; *In re J.R.D.*, 169 S.W.3d 740, 743 (Tex. App.—Austin 2005, pet. denied). In reviewing a trial court's decision, we should bear in mind that it "is in a better position to determine what will be in the best interest of the child since it faced the parties and their witnesses, observed their demeanor, and had the opportunity to evaluate the claims made by each parent." *J.R.D.*, 169 S.W.3d at 743.

Legal and factual sufficiency challenges are factors we consider in assessing whether the trial court abused its discretion, rather than independent grounds of error. *Zeifman v. Michels*, 212 S.W.3d 582, 587-88 (Tex. App.—Austin 2006, pet. denied); *see J.R.D.*, 169 S.W.3d at 743. We ask first whether the court had sufficient information on which to exercise its discretion and second whether it erred in its application of that discretion. *Echols v. Olivarez*, 85 S.W.3d 475, 477-78 (Tex. App.—Austin 2002, no pet.). A trial court does not abuse its discretion as long as some evidence of a probative nature exists to support the court's decision, *id.*, and we generally will not

find an abuse of discretion when the trial court bases its decision on conflicting evidence, *see In re K.R.P.*, 80 S.W.3d 669, 674 (Tex. App.—Houston [1st Dist.] 2002, pet. denied).

In *Lenz*, the supreme court discussed Texas's best-interest standard in the context of a modification suit seeking to relocate the children, noting "the Legislature's overarching goals of assuring that children will have frequent and continuing contact with parents who have shown the ability to act in the best interest of the child and to provide a safe, stable, and nonviolent environment for the child." 79 S.W.3d at 14, 16 (citing Tex. Fam. Code § 153.001(a)); *see K.L.W.*, 301 S.W.3d at 425. The court held that the following factors were relevant considerations: reasons for and against the move; the effect the move would have on extended family relationships; its effect on visitation and communication with the non-custodial parent to maintain a full and continuous relationship with the child; the possibility of a visitation schedule allowing the continuation of a meaningful relationship between the non-custodial parent and child; and the nature of the child's existing contact with both parents and the child's age, community ties, and health and educational needs. *Lenz*, 79 S.W.3d at 15-17. Although *Lenz* was a modification proceeding, the factors are equally applicable to this original suit for conservatorship. *See Morgan v. Morgan*, 254 S.W.3d 485, 488 (Tex. App.—Beaumont 2008, no pet.); *see also Deinhart v. McGrath-Stroatman*, No. 03-09-00283-CV, 2010 WL 4595708, at *6-7 & n.5 (Tex. App.—Austin Nov. 10, 2010, pet. denied) (mem. op.) (applying *Lenz* factors to divorce case in which jury determined that mother should be allowed to relocate children to California).

In this case, the trial court heard testimony from both Martin and Norman, who presented different views of the circumstances. Based on the testimony before the trial court, which

12

included evidence about the locations of Norman's offices and how often she drives to both offices, the distance between Martin's apartment and Norman's house in Bastrop, Martin's desire and ability to be a caretaker during Norman's workdays, and Norman's and her family members' behavior toward Martin and their actions related to his time with S.M.N., we cannot conclude that the trial court abused its discretion in restricting S.M.N.'s residence to Travis County. *See Lenz*, 79 S.W.3d at 15-17; *J.R.D.*, 169 S.W.3d at 743 (trial court is in better position to evaluate witness demeanor and credibility). We overrule Norman's first issue on appeal.

**Retroactive Child Support**

In her second issue, Norman contends that the trial court abused its discretion in refusing to award her retroactive child support, an issue we also review for an abuse of discretion. *See Monroy v. Monroy*, No. 03-10-00275-CV, 2011 WL 3890401, at *4, 6 (Tex. App.—Austin Aug. 31, 2011, pet. denied) (mem. op.); *Ayala v. Ayala*, 387 S.W.3d 721, 726-27 (Tex. App.—Houston [1st Dist.] 2011, no pet.); *see also* Tex. Fam. Code § 154.009(a) (trial court "may order" retroactive child support). In ordering retroactive support, the trial court must consider the father's net resources during the relevant time period, efforts by the mother to notify the father of his paternity, whether he had knowledge of his paternity, whether an order of retroactive child support will impose an undue financial hardship on the father or his family, and whether he has provided actual support or other necessaries before the filing of the action. Tex. Fam. Code § 154.131(b). The trial court heard conflicting testimony about Martin's efforts to help support his son while they lived together and his attempts to pay child support after he moved out. It also heard about the parties' financial situations, including Martin's debt load and Norman's income. Based

13

on this record, we cannot conclude that the trial court abused its discretion in refusing to order Martin to pay retroactive child support. *See J.R.D.*, 169 S.W.3d at 743 (trial court is in better position to evaluate witness demeanor and credibility); *K.R.P.*, 80 S.W.3d at 674 (appellate court generally will not find abuse of discretion if trial court bases decision on conflicting evidence). We overrule Norman's second issue on appeal.

## Conclusion

Having overruled Norman's issues on appeal, we affirm the trial court's order.

_____

Jeff Rose, Chief Justice

Before Chief Justice Rose, Justices Goodwin and Kelly

Affirmed

Filed:   March 28, 2019